IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

PAMELA L. JONES,

                    Plaintiff,

          vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration;

                    Defendant.

**8:12CV379**

**MEMORANDUM AND ORDER ON
REVIEW OF THE FINAL DECISION
OF THE COMMISSIONER OF SOCIAL
SECURITY**

Pamela L. Jones filed a complaint on October 24, 2012, against Michael J. Astrue, who was then serving as Commissioner of the Social Security Administration.  (ECF No. 1.)  Jones seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. The defendant has responded to the plaintiff's complaint by filing an answer and a transcript of the administrative record.  (See ECF Nos. 15, 35-36).  In addition, pursuant to the order of Judge Joseph F. Bataillon, dated March 18, 2013, (ECF No. 19), each of the parties has submitted briefs in support of her position.  (See generally Pl.'s Br., ECF No. 21; Def.'s Br., ECF No. 31; Pl.'s Reply Br., ECF No. 38).  After carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

Jones initially applied for disability benefits on May 16, 2008, alleging an onset date of July 30, 2003. (See ECF No. 35, Transcript of Social Security Proceedings (hereinafter "Tr.") at 166). The record does not include the disposition of this application. On April 14, 2009, Jones protectively filed an application for disability insurance benefits under Title II of the Act. (Tr. at 173-76). After her applications were denied initially and on reconsideration, (id. at 68-71, 76-79) the plaintiff requested a hearing before an administrative law judge (hereinafter "ALJ").  (Id. at 85-86). This hearing was conducted on January 11, 2011. (Id. at 24-63.) In a decision dated January 28, 2011, the ALJ concluded that Jones was not entitled to disability insurance benefits. (Id. at 6-22). The Appeals Council of the Social Security Administration denied Jones' request

for review. (Id. at 1-5.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Jones seeks judicial review.

## II.     SUMMARY OF THE RECORD

Jones was born on September 15, 1955. (Id. at 173). She has a 12th grade education (id. at 26) and was last insured for social security disability benefits on March 31, 2009. (Id. at 10). In the application at issue here, Jones alleged an onset date of September 1, 2005. (Id. at 173). At the hearing, Jones requested to amend the alleged onset date to July 30, 2003. (Id. at 26). On a disability report form, Jones asked to amend the onset date to September 16, 2003. (Id. at 233). The ALJ found it inappropriate to allow any amendment, finding that the evidence about Jones' medical condition and functional capacity between July 30, 2003, and September 1, 2005, had not been evaluated by the state agency. The determinations at the initial and reconsideration level of the claim considered Jones' condition between September 1, 2005, and March 31, 2009, the date Jones was last insured. (Id. at 9). The ALJ determined that, pursuant to 20 C.F.R. § 404.946, the issue of Jones' status prior to September 1, 2005, involved a medical determination that should not be addressed for the first time at the hearing level, and therefore, was not properly before the ALJ. (Tr. at 9).

The regulation cited by the ALJ provides that an ALJ or any party may raise a new issue at a hearing, but "it may not be raised if it involves a claim that is within the jurisdiction of a State agency under a Federal–State agreement concerning the determination of disability." 20 C.F.R. § 404.946(b)(1). Jones does not assign as error the ALJ's determination as to the onset date. I agree with the ALJ and will evaluate the record in relation to an onset date of September 1, 2005.

On a disability report form completed on April 14, 2009, (id. at 201) Jones listed her conditions as fibromyalgia, back problems, depression, problems concentrating and remembering, and dizzy spells. (Id. at 203). She stated that she uses a cane to walk and uses a motorized cart in a store. Jones said she can walk five minutes and then needs to rest. (Id.). Jones said she stopped working on August 15, 2007. (Id.). On a disability report form completed on October 1, 2009, Jones said she is barely able to use her leg and is limited in walking. She also said she has anxiety and dizzy spells. (Id. at 240).

On April 4, 2009, Jones completed a report of her daily activities and symptoms. (Id. at 250). Jones stated that in a typical day, she gets up, has breakfast, and dresses. She showers with the assistance of her husband. Jones stated that she reads the newspaper and cares for herself during the day. She wears a wig because she cannot fix her hair every day. Her husband helps with cooking because she cannot lift pots of water. She said she has pain in her hands and arms and has to be careful in gripping items. She said she does not carry or lift anything heavier than one pound. Her husband carries the clothes for the laundry and then folds the clothes and puts them away. She said she performed no outside chores. Jones said she has motion sickness and dizzy spells when she drives a car. (Id.). She said she watched two hours of television each day. (Id. at 251). She no longer attended church because dressing is such an effort. Jones said she takes a sleep aid every night. She can walk for one minute and then the pain starts. (Id.). She can only stand for four minutes and then needs to sit, but sitting too long causes numbness in her legs. (Id.). Jones said she has fibromyalgia which causes pain all over every day. Her pain level is 10. (Id. at 252).

In interrogatories dated November 15, 2010, Jones listed her conditions as fibromyalgia, knee problems, inflammatory arthritis, osteoarthritis, dizziness, feet problems, memory problems, depression, anxiety, and irritable bowel syndrome. (Id. at 257). She said she has pain, difficulty remembering dates and messages, difficulty with mobility, and has anxiety attacks, fatigue, and dizziness. (Id.). She said she must lay down three times each day for about one to two hours each time for constant pain. (Id. at 258). She said she had previously taken part in aquatherapy but she could no longer afford it. (Id. at 260). Jones said she cannot watch television for more than 25 minutes at a time because she cannot concentrate. (Id. at 263). Jones said she had been told by her doctor to sleep for 12 to 14 hours per day. (Id.).

*A. Medical Evidence*

Jones began treatment with Kathryn Wildy, M.D., a rheumatologist, on November 8, 2007. (Id. at 303). Wildy noted that Jones reported she had bilateral low back pain in 2005. (Id. at 304). Jones was able to ambulate in Wildy's office without distress. (Id.). Wildy determined that Jones had probable inflammatory arthritis and fibromyalgia. Wildy prescribed prednisone and injected steroids into both knees. Wildy recommended a combination of medications and aquatherapy for fibromyalgia. (Id. at 305).

3

X-rays of Jones taken on November 8, 2007, showed moderate to severe bicompartmental osteoarthritic changes in the left knee, unicompartmental changes in the right knee specifically affecting the patellofemoral joint, and chondrocalcinosis. Bilateral hip x-rays showed osteoarthritic changes about the superior acetabulum on the left, with similar findings on the right with mild joint space narrowing bilaterally. (Id. at 321). X-rays of the sacroiliac joints showed some sclerotic changes and rather significant degenerative changes at the L5-S1 level with hypotrophic zygapophysial joint disease most pronounced on the right. (Id. at 329). A radiologic report on November 16, 2007, showed that Jones has grade 1 degenerative anterolisthesis of L4-5 and L5 on S1. (Id. at 275, 322).

When Jones began physical therapy on December 5, 2007, she reported that in early November she was dancing at her husband's birthday party, and since that time, she noticed increased neck, shoulder, and back pain. (Id. at 270). For the previous two years, Jones said she had been in pain all the time and rated the pain at 10 on a scale of 1 to 10. She reported radiating pain into both upper arms and tingling in her hands. Jones told the physical therapist that, as recently as October 2007, she had been doing aquatic exercise and an exercise video at home. She said she was independent with cooking and activities of daily living, but her husband had to carry laundry up and down the stairs. She said she sometimes uses a single point cane, but she was noted to have normal sequencing and timing throughout the gait cycle. (Id.). Jones noted tenderness throughout her cervical spine, upper trapezius, bilateral subacromial spaces, and bilateral greater trochanter. (Id. at 270-71). The physical therapist noted that Jones would benefit from aquatic physical therapy as well as a home exercise program, additional relaxation techniques, and activity modification for her diagnosis of fibromyalgia. (Id. at 272). The plan was for Jones to take part in aquatic physical therapy two to three times each week for four to eight weeks. (Id.).

As of January 4, 2008, Jones had attended aquatic physical therapy eight times, but she had missed four visits due to "increased pain, busy schedule," and she failed to show up for one visit. She had been able to tolerate a 48-minute treatment session.  (Id. at 273). She called the clinic to cancel her remaining physical therapy visits, stating that she would like to be discharged from aquatic therapy due to financial constraints, but she would like to continue with independent aquatic exercise. (Id. at 273, 306). Jones had noted the ability to modify her activity to manage pain, such as carrying lighter grocery bags and using an electric cart. She told the

therapist that she had stopped her medications without physician or pharmacist recommendation, but she started them about one week later. The therapist stated that Jones had difficulty managing pain due to subjective information regarding management of stress as well as medications. (Id. at 274).

Wildy noted on January 16, 2008, that Jones' inflammatory arthritis was unresponsive to prednisone. (Id. at 300). She was also diagnosed with fibromyalgia with significant myofascial syndrome and allodynia; significant diffuse osteoarthritis; and recent onset of significant dizziness and motion sickness. (Id.). Wildy noted that the bilateral steroid injections she gave Jones on November 8, 2007, were not extremely helpful. Jones had also been prescribed Neurontin, which caused some side effects. She was directed to begin aquatherapy, but Jones reported that her insurance would not cover formal aquatherapy, so she was directed to use the pool at Immanuel Hospital, using exercise instructions from a physical therapist. (Id.). She said her maximum pain is 10 out of 10 and her most difficult activities are doing her hair, taking showers, and walking. (Id. at 301). She also noted fatigue, hair loss, vision changes, intermittent difficulty swallowing, stomach problems, intermittent muscle weakness, and intermittent tingling and numbness in the lower extremities. (Id.). Wildy noted that Jones presented with a number of perplexing symptoms. (Id. at 302).

Wildy referred Jones to Britt Thedinger, M.D., to address her complaints of motion sickness. (Id. at 294). On February 4, 2008, Thedinger reported that Jones' otologic examination was normal. Thedinger diagnosed Jones as having a classic case of motion intolerance. She recommended medication for the days when Jones was engaging in activities that make her feel ill. (Id.). On May 28, 2009, Thedinger prescribed medication for several weeks to help suppress Jones' vestibular system. However, Thedinger did not hear back from Jones, so she could not assign any type of disability. (Id. at 519).

Wildy told Jones on April 23, 2008, that treatment for fibromyalgia involved improvement of sleep efficacy and control of any concomitant psychologic/psychiatric irritability. (Id. at 294, 298). Wildy also told Jones that generalized osteoarthritis exacerbates the fibromyalgia, as does depression. (Id. at 298). Wildy asked Jones to continue with aquatherapy. (Id. at 299). Wildy prescribed several medications and directed Jones to return to aquatherapy and to start glucosamine/chondroitin sulfate. Wildy stated that Jones had signs and symptoms of

inflammatory arthritis, but it was perplexing given Jones' unresponsiveness to steroids. (Id. at 299).

On July 23, 2008, Jones went to Wildy complaining of bilateral knee pain and left wrist discomfort. (Id. at 422). Wildy noted that Jones was able to ambulate in the room without distress and that she had normal range of motion in the upper extremities. The lower extremities showed bilateral pes anserine bursal irritability. Her knees were cool without bulge sign with normal range of motion. Wildy gave Jones injections in both knees. She was also diagnosed with vitamin D deficiency which could be contributing to aches and pains. Wildy adjusted Jones' medications for probable seronegative inflammatory arthritis. (Id. at 423). Jones was advised to wear wrist splints at night for her left wrist irritability. (Id.).

By February 2009, Jones reported increasing problems with all-day morning stiffness in the knees, fear and anxiety, and dizzy spells. (Id. at 732). She was given steroid injections in both knees and Lidoderm patches to use for bilateral bursitis in the arms. (Id. at 732-33). Jones had more bilateral knee injections about two weeks later. (Id. at 730).

On May 14, 2009, Jones reported to Wildy that she had increased her methylprednisolone without contacting the office because she was in more pain. (Id. at 575). Jones reported that the medication had helped, but she was still having problems with sleep disturbance. Wildy told Jones that better sleep would help her arthritis and fibromyalgia pain. (Id.). Wildy adjusted Jones' medications and again recommended aquatherapy. (Id. at 576).

In an MRI on May 22, 2009, Jones had a trace of anterior spondylolisthesis of L4 on L5 and L5 on S1. At L5-S1 there was disk space desiccation and minimal disk bulge. The MRI showed degenerative disk changes at L4-5 and L5-S1 with stable appearance since 2007. (Id. at 508).

Jones continued to see Wildy, but in June 2009, Jones had not yet been to see a psychologist and had not returned to aquatherapy. (Id. at 571). By July 2009, Jones reported that her concentration had improved with medication. Her main complaint was bilateral burning in the arms and hips as well as tingling and numbness in the upper extremities. (Id. at 567). Jones reported that she had not attended aquatherapy, and Jones said she is frustrated and has too much anxiety to pursue necessary treatment. Jones said she was aware that this was halting her progress toward feeling better. (Id.). Wildy adjusted the medication for inflammatory arthritis and sleep disturbance. (Id. at 568). Wildy referred Jones for an MRI of the cervical spine, which

6

showed that she had degenerative cervical spondylosis, most pronounced at the C5-C6 level on the right. (<u>Id</u>. at 580).

Wildy also referred Jones to Mark E. Shirley, D.O., who completed an osteopathic manipulation. (<u>Id</u>. at 593). Shirley noted that Jones was able to transition on the examination table normally and with no pain, and from sitting to standing with no pain. (<u>Id</u>. at 592). Her gait was normal and unassisted. She was diagnosed with fibromyalgia syndrome, mechanical low back pain, and sacroiliac dysfunction. She was also referred for myofascial/visceral therapy. (<u>Id</u>. at 593).

Jones was given bilateral knee steroid injections again on October 2, 2009. (<u>Id</u>. at 689). Wildy again recommended aquatherapy for fibromyalgia. Jones also complained of dysesthesias, and Wildy recommended another spine MRI, but Jones was unwilling to undergo it. Jones had an appointment with her primary care physician the next week and she was scheduled to ask him about the MRI. However, in a follow-up note, Wildy stated that Jones did not make it to her appointment with her primary care physician. (<u>Id</u>. at 689).

Wildy again counseled Jones in March 2010 that it was imperative that she take part in some type of physical therapy or aquatherapy to overcome the fibromyalgia, which Jones indicated was very frustrating. (<u>Id</u>. at 681). Wildy recommended that Jones continue to see a mental health professional for her anxiety. (<u>Id</u>.). The next month, Jones reported that she was falling more, but she was unsure of the reason. (<u>Id</u>. at 691). Jones said she uses a cane for steadiness, but she does not like to use it when she goes out with friends. (<u>Id</u>.).

On June 14, 2010, Jones went to the emergency room for a flare-up of fibromyalgia. (<u>Id</u>. at 717). She complained of body aches all over and reported that she had not taken her medications that night before because the only thing that would help was a morphine shot. However, she moved freely without restriction or restraint. (<u>Id</u>.). Jones was given an injection of morphine and discharged. (<u>Id</u>. at 717-18).

Jones visited Amy E. Schuett, M.D., on October 11, 2010, complaining of depression. (<u>Id</u>. at 665). Jones reported that she had taken additional medication, which helped relieve her increased anxiety. However, she said she was talking and eating in the middle of the night while taking Ambien. Jones said she did not want to change medications. Schuett stated that Jones gave mixed messages about her depression, stating it was getting better but then stating it was the same. Jones stated she had not let people in her house for eight years and had not opened the

curtains in eight years, but she had hosted a shower for a niece and said she had a good time. (Id. at 665). Schuett stated that Jones' mood and affect did not seem depressed, but she had always had a bright affect despite feeling quite depressed. (666). Jones moved and walked slowly. She had no suicidal or homicidal ideations and no psychosis. Her anxiety manifested itself with a racing heartbeat and "butterflies" in her stomach. Jones complained of concentration, attention, and memory problems and said she was not as sharp as usual. She started vitamin D and omega-3 and stated that she was now able to do Sudoku puzzles. Her insight and judgment seemed to be somewhat limited. (Id. at 666). Jones was diagnosed with major depressive disorder, recurrent, moderate. Her medications were adjusted. The report indicated it was signed electronically by Schuett, on October 13, 2010, which was 18 months after Jones' date last insured. (Id. at 666).

### B. Medical Opinion Evidence

Linda Schmechel, Ph.D., completed a mental residual functional capacity (RFC) assessment of Jones on July 21, 2009. (Id. at 528). Schmechel found that Jones was not significantly limited in the ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 528-29). Jones was not significantly limited in any category of social interaction or adaptation. (Id. at 529). Schmechel found that Jones had moderate limitations in the ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. (Id. at 528).

Schmechel stated that Jones was diagnosed with depression, which was a medically determinable impairment that did not precisely satisfy other diagnostic criteria. (Id. at 536). As to paragraph B restrictions, Schmechel stated that Jones had mild restriction of activities of daily living and in maintaining social functioning. (Id. at 543). She had moderate difficulties in maintaining concentration, persistence, or pace, but she had no repeated episodes of decompensation. (Id.). Schmechel found no evidence to establish the presence of paragraph C criteria. (Id. at 544). Schmechel noted that Jones had been prescribed amitriptyline. (Id. at 545).

Her medications were being monitored by her primary care physician rather than a therapist. Schmechel said there may be some moderate concentration deficits due to medications. (Id.).

Arthur Weaver, D.O., completed a physical RFC on July 21, 2009. (Id. at 547-554). Weaver found that Jones could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Id. at 548). She could stand and/or walk at least two hours in an eight-hour workday and sit about six hours in an eight-hour workday. She had no limitations on pushing and/or pulling. Weaver said that Jones had muscle strength of five out of five, equal and bilateral, and normal range of motion throughout. (Id.). Weaver said Jones could occasionally balance, stoop, kneel, crouch, and crawl. She had no postural limitations, (Id. at 549) and no manipulative, visual, communicative, or environmental limitations. (Id. at 550-51). Weaver recommended that Jones avoid concentrated exposure to extreme cold. (Id. at 551). Weaver stated that Jones was partially credible because the severity she noted was not completely consistent with the objective examination in the file dated May 14, 2009. (Id. at 554).

James J. Bane, M.D., also completed a physical RFC on October 23, 2009. (Id. at 614-21). Bane determined that Jones could frequently or occasionally lift and/or carry 10 pounds. (Id. at 615). She could stand and/or walk at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday. She was limited in pushing and/or pulling in the lower extremities. (Id. at 615). He stated that she could occasionally climb, stoop, and crouch, but never balance or crawl. (Id. at 616). She had no manipulative, visual, or communicative limitations. (Id. at 617-18). Bane recommended that Jones avoid concentrated exposure to extreme cold or heat and vibration, but she was unlimited in other environmental considerations. (Id. at 618). Bane stated that Jones' credibility was partial. (Id. at 621). She had previously filed for disability in 2008 but did not submit evidence of activities of daily living. (Id.).

Patricia Newman, Ph.D., completed a psychiatric review technique form on October 6, 2009. (Id. at 596). Newman found no medically determinable impairment as of March 31, 2009, the date last insured. (Id.). Newman noted that Jones alleged disability due to depression, difficulty with concentration and remembering, as well as physical issues. Her report of activities of daily living noted numerous limitations due to physical issues, but no limitations were specifically related to mental problems. (Id. at 608). The medical records contained no psychiatric diagnosis from an acceptable medical source between the alleged onset date and March 31, 2009. Jones did not see a mental health provider until June 26, 2009, when she was

seen at a clinic with a complaint of anxiety. She was diagnosed with major depressive disorder, recurrent severe, but the notes did not contain the name of the provider who did the evaluation. Thus, Newman stated that there was no mental diagnosis from any acceptable medical source as of March 31, 2009. (Id. at 608).

### C. Hearing Testimony

At a hearing in Omaha, Nebraska, on January 11, 2011, (Id. at 23) Jones testified that she had attended aquatherapy several years earlier, but she stopped because she did not want to pay for the therapy when she could do the exercises on her own at a pool. (Id. at 43). Jones said she was no longer going to the pool on her own because she needs to take naps and that Wildy told her to get 12 to 14 hours of sleep each day. (Id. at 44). She had never gone to the pool in the winter because she felt worse after getting in the pool and then going out in the cold. She did not want to drive herself to the pool, but her husband told her he would drive her again in the spring. (Id.).

Jones said she has pain in her face, shoulders, arms, thighs, knees, legs, feet, and fingers. (Id. at 45). She can feel the pain start to lift within 45 minutes of taking medication, but she is never completely pain-free. (Id.). The pain is worse if she overdoes it and it is relieved if she rests, except her hips and back still bother her in bed. (Id. at 45-46).

Jones described her typical day as getting up at 9 a.m., having breakfast, and taking medications. She said she tries to load the dishwasher, but her husband unloads it because she cannot stretch her arms to put items away in the higher cabinets. (Id. at 46, 48). Jones said she interacts with her dogs. She does laundry once a week. She is able to load the washer and then takes items out one by one and puts them in the dryer. Her husband carries the clothes downstairs to the laundry room and then carries the clothes upstairs and folds and puts everything away. Some days she tries to cook dinner. But she said she usually bakes items so she does not have to stand over a skillet. (Id. at 46). Jones said she tries to dust and can sweep once in a while, but her husband does all the vacuuming. She said she makes her side of the bed, but does not clean the bathroom. (Id. at 47). She said her husband shops for groceries. She said she was able to take care of herself. Her hobbies are reading, doing Sudoku puzzles, and watching television. She goes to church about once every six weeks. (Id. at 47-48). Jones said she helps with events at church about every four months when she feels up to it. (Id. at 48). She goes to bed at 9 p.m.

(<u>Id</u>.). She takes a nap of 40 minutes to an hour after taking one of her medications, and she usually takes about three naps each day. (<u>Id</u>. at 49).

Jones testified that she had gone to the emergency room two days in a row to get a shot of morphine for pain. (<u>Id</u>. at 42) She wanted to return a third day, but she did not want the physicians to think she was addicted. (<u>Id</u>.).

Jones said she cannot work at any job because her comprehension and organization skills are not good because her brain and memory are not as they were previously. (<u>Id</u>. at 49). Wildy told Jones one of the side effects of fibromyalgia is its effect on memory. (<u>Id</u>. at 50). Jones said she can sit for an hour and then she has to get up and move around because her back bothers her. (<u>Id</u>.). She can stand for five minutes before her back causes her pain. (<u>Id</u>. at 51). Jones said she can lift about one pound. She has chronic pain all over which her doctor said is from fibromyalgia. (<u>Id</u>.).

Steven Schill, vocational expert, stated that Jones had previously worked as an accounting clerk, which is skilled sedentary work. (<u>Id</u>. at 60). The ALJ asked a hypothetical question of whether someone of Jones' age, educational level, and work history with restrictions on lifting, standing, and sitting would be able to do claimant's past work, and Schill answered in the affirmative. (<u>Id</u>. at 61). A person with Jones' self-imposed restrictions of five minutes maximum sitting, three minutes standing, and never lifting more than three pounds would not be able to do the past work or any other jobs in the national or regional economy. (<u>Id</u>.). Having listened to Jones' testimony, Schill said if it was credible, there would not be any work she could do because of her frequent naps. (<u>Id</u>. at 62).

### D. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be disabled at step three or step five. See <u>id</u>. In this case, the ALJ found that Jones is not disabled. (See Tr. at 9-17).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See <u>Id</u>. The ALJ

found that Jones has not engaged in substantial gainful activity from the alleged onset date of September 1, 2005, through her date last insured, March 31, 2009. (Tr. at 11).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c).   A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."   See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").   Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."   20 C.F.R. § 404.1521(b).   If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.   See 20 C.F.R. § 404.1520(a)(4)(ii), (c).   The ALJ found that Jones had the following severe impairments: seronegative inflammatory arthritis; fibromyalgia; bilateral subacromial bursitis; osteoarthritis of the knees and back; and degenerative changes in the lumbar and cervical spine. The ALJ found no mental impairment. (Tr. at 12 (citation omitted)).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.   See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see also 20 C.F.R. Part 404, Subpart P, App'x 1.   If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be disabled.   See 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.   See 20 C.F.R. § 404.1520(a).   The ALJ found that Jones did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.   (Tr. at 13 (citations omitted)).

Step four requires the ALJ to consider the claimant's RFC to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).   If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.   See 20 C.F.R. § 404.1520(a)(4)(iv), (f).   In this case, the ALJ wrote:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she cannot use her lower extremities to push or pull. She can climb, stoop, and crouch only occasionally. She is unable to balance, kneel, or crawl. She must avoid concentrated exposure to extreme temperatures and to vibration.
(Tr. at 13).

The ALJ also found that Jones, through the date last insured, was capable of performing past relevant work as an accounting clerk. This work did not require the performance of work-related activities precluded by Jones' RFC. 20 C.F.R. § 404.1565. (Tr. at 17). The ALJ concluded that Jones was not under a disability at any time between September 1, 2005, and March 31, 2009. (Id.).

III.  STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

13

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

Jones asserts that the Commissioners' decision is not supported by substantial evidence on the record as a whole and that it does not comply with correct legal and regulatory standards. (Pl.'s Br. at 14). I will address her specific arguments below.

### Evaluation of Credibility

First, Jones argues that the ALJ improperly evaluated her subjective complaints and improperly dismissed her testimony as not being credible. The ALJ discounted the accuracy of Jones' assessment of her pain, in part, because Jones stated that her pain was at a level of 10 out of 10 for two years. However, during that time, she stated that she felt increased pain after dancing at her husband's birthday party. (Tr. at 15). The ALJ also noted that her doubt about Jones' pain was increased based on the aquatic therapist's note that Jones missed four of eight appointments due in part to her busy schedule.

The ALJ also noted that Jones stated that she was not able to succeed at a job as an officer manager because she had chronic pain, but she also attributed her lack of success to an inability to remember. Thus, she provided two disparate and inconsistent accounts of the reason she could not do the work. (Id. at 16). In sum, the ALJ stated that the evidence established that Jones was not a reliable source of information about her condition or her functional limitations. (Id. at 17).

The ALJ stated that she took into consideration all of Jones' symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence. (Id. at 13). The ALJ found that Jones' medically determinable impairments could reasonably be expected to cause at least some of the symptoms she alleged. However, her statements concerning the intensity, persistence and limiting effects of these symptoms were not

14

fully credible. (Id. at 14). The ALJ said several factors tended to detract from the weight her testimony deserved. (Id.). At the hearing, Jones attempted to give the impression that she is virtually homebound and that, while at home, she spends virtually all of her time in bed either napping or sleeping. However, in her written report of daily activities, Jones did not mention taking naps. She was specifically asked if she takes naps and she wrote that she takes medication to help her sleep every night. At the hearing, she testified that she watches some television, but on the form she wrote that she watched crime shows, forensics, Oprah, and news for two hours daily. She provided inconsistent reports about her activities. Her husband also provided information about her daily activities, but, again, he said nothing about Jones taking naps. (Id. at 14).

The credibility of the claimant is important in evaluating the subjective complaints of impediments. Johnson v. Apfel, 240 F.3d 1145 (8th Cir. 2001). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Id., 240 F.3d at 1148.  Jones testified that she had trouble concentrating, but she also stated that she solved Sudoku puzzles. (Tr. at 47). She alleged that she could only stand or walk for several minutes, but she told a physical therapist that she was dancing at her husband's birthday party in November 2007. (Id. at 51, 270). Jones testified that she was able to prepare meals, load the dishwasher, wipe down the refrigerator, assist with the laundry, and was able to take care of most of her personal hygiene needs. (Id. at 46-48).

In addition, Jones told the physical therapist that she had stopped her medications without a recommendation from a physician or pharmacist and she did not try Lexapro when it was recommended by a physician. (Id. at 15). The ALJ stated that a person who was experiencing the tremendous functional limits and symptoms described by Jones would be unlikely to choose not to follow the advice and prescriptions of medical professionals. Since Jones did not follow that advice, the ALJ concluded the symptoms are not as oppressive as Jones described. (Id.).

The U.S. Circuit Court of Appeals for the Eighth Circuit has stated that "[f]ailure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application of benefits." Johnson v. Apfel, supra, 240 F.3d at 1149. An ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications. Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). The record also shows that Wildy told Jones on a number of occasions that it was imperative for her to

return to aquatherapy, but she chose not to. (Tr. at 299, 430, 568, 571, 681, 689, 693). In fact, Jones admitted that she never went to aquatherapy when the weather was cold. (Id. at 44). Jones' failure to always follow physician's directions regarding medications and exercise are in conflict with the alleged severity of her symptoms.

Jones also stated that Wildy ordered her to get 12 to 14 hours of sleep each day, but none of the treatment records from Wildy include that recommendation. (Id. at 14, 44). While Jones told one medical professional that she stopped taking Savella because it made her concentration worse, she told Wildy that she felt the Savella had improved her concentration but that she had discontinued it due to perceived side effects. (Id. at 15). Inconsistent statements to medical professionals may be considered in evaluating a claimant's credibility. Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005).

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the court noted that "[t]he adjudicator may not disregard a plaintiff's subjective complaints solely because the objective medical evidence does not fully support them." The court stated that the adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Id.

The record shows that the ALJ took all of these factors into consideration. She considered the medical evidence in combination with Jones' alleged limitations. (Tr. at 15-16). The ALJ noted that Jones went to the emergency room asking for a morphine shot and stating that she had not taken her pills because only the shot would help. The attending physician noted that Jones did not appear to be in any discomfort or distress. (Id. at 717). In fact, Jones had no tenderness in her neck, back, or extremities, and she walked with a normal gait without restriction or restraint. (Id.). The ALJ determined that it was unlikely that Jones was experiencing pain to the degree she reported when she went to the emergency room. At the hearing, Jones stated that she went to the emergency room two days in a row and wanted to go a third day, but there was no evidence in the record that she went more than once. (Id. at 16).

The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. Johnson v. Apfel, supra. I find that the ALJ thoroughly reviewed the

medical evidence and properly considered Jones' credibility in reaching the decision that Jones is not disabled. The ALJ provided sufficient support for her decision.

*Mental Health Diagnoses*

Second, Jones argues that the ALJ improperly excluded Jones' mental health diagnoses as severe impairments. The ALJ found that Jones had the following severe impairments: seronegative inflammatory arthritis; fibromyalgia; bilateral subacromial bursitis; osteoarthritis of the knees and back; and degenerative changes in the lumbar and cervical spine. 20 C.F.R. § 404.1520(c). (Tr. at 12). The ALJ found that Jones' complaints of motion sickness did not result in more than slight limitations in her ability to perform basic work-related activities, and therefore, it was not a severe impairment. (<u>Id</u>.). Jones received counseling in June 2009 for fear and anxiety, but the ALJ found there was no evidence in the record that Jones had any functional limits as a result of any cognitive or emotional problems prior to her last date insured, March 31, 2009. Therefore, the ALJ found that she had no severe impairment during the period of time at issue. (<u>Id</u>. at 13).

Jones asserts that the record indicates that as early as 2005 she was experiencing anxiety, depression, and excessive worry, and that she was having trouble getting her thoughts together. (<u>Id</u>. at 345). Wildy noted in April 2008 that Jones' fibromyalgia symptoms were likely exacerbated by depression. (<u>Id</u>. at 450-452). Wildy noted in February 2009 that Jones was experiencing fear and anxiety and Wildy discussed the negative effects of anxiety and muscle tension on Jones' condition. (<u>Id</u>. at 439-40). Jones argues that all of these references to mental impairments occurred prior to Jones' insurability date of March 31, 2009, and that the treatment of her mental health concerns is but one example of the ALJ improperly picking and choosing evidence from the record to support the denial of benefits. (Pl.'s Br. at 19).

Pursuant to 20 C.F.R. §§ 404.1520(c), 404.1521(a), a severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities. Basic work activities include the abilities and aptitudes necessary to perform most jobs. See 20 C.F.R. § 404.1521(b). These include understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). A claimant's diagnosis of suffering from a mental or emotional impairment does not necessarily mean that the impairment is severe. <u>Buckner v. Astrue</u>, 646 F.3d

17

549 (8th Cir. 2011) (The ALJ had substantial evidence supporting a conclusion that the claimant's depression and anxiety were "not severe.")

The ALJ found that Jones' mental impairments did not significantly limit her ability to engage in substantial gainful activity. (Tr. at 13). The ALJ noted that Jones did not receive any counseling or regular mental health treatment until after her date of last insured (Id.) and she did not attend counseling until June 2009. (Id. at 13, 525). The record contains few references to any mental impairments prior to the date of last insured, March 31, 2009. Jones mentioned emotional instability to Wildy in April 2008, but Wildy did not refer Jones to any mental health professional. (Id. at 298-99). Again, in February 2009, Jones told Wildy she was anxious, but Wildy did not record any diagnosis of a mental impairment or suggest that Jones seek additional treatment. (Id. at 439-40). Jones did not complain of any emotional or mental problems during other visits with Wildy prior to her date last insured. (Id. at 301-05, 422-23, 435-36).

The ALJ's finding that Jones' mental impairments were not severe prior to her date last insured was supported by the evidence in the record. In a psychiatric review technique completed on October 6, 2009, Newman noted that Jones' report of activities of daily living did not include any limitations specifically related to mental problems. (Id. at 608). Newman noted that although Jones was diagnosed with major depressive disorder, recurrent severe, the notes did not contain the name of the provider who did the evaluation, and therefore, there was no mental diagnosis from any acceptable medical source as of March 31, 2009. (Id.).

Jones did not begin seeing a psychiatrist, Schuett, for depression until October 11, 2010. (Id. at 665). Schuett stated that Jones gave mixed messages about the depression. (Id.). Although Jones said she had difficulty with concentration and memory problems, she was able to complete Sudoku puzzles. (Id. at 666). It is Jones' burden to present evidence to support her alleged impairments. Nothing in the record established any mental health impairment as of the date last insured. The ALJ correctly determined that Jones had no severe mental health impairments.

### Determination of RFC

Jones also argues that the Commissioner failed to appropriately account for all of Jones' impairments in determining her RFC. The ALJ determined that Jones can do sedentary work, except that she cannot use her lower extremities to push or pull. She is able to climb, stoop, and crouch only occasionally, and unable to balance, kneel or crawl. (Id. at 13). Jones asserts that her

18

actual RFC with the appropriate inclusion of pain limitations would preclude competitive employment. (Pl.'s Br. at 26).

A claimant's RFC is the most she can do despite the combined effect of her credible limitations. See C.F.R. § 404.1545. It is the claimant's burden to prove her RFC, and it is the ALJ's responsibility to determine the RFC based on all relevant evidence in the record, including medical opinions and the claimant's credible statements about her limitations. "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004).

In this case, the record includes a mental RFC assessment and two physical RFC assessments. The mental RFC showed that Jones was not significantly limited in the ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, and to perform activities within a schedule, among other routine activities. (Tr. at 528-29). Schmechel found that Jones had moderate limitations in the ability to understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods. (Id. at 528). Jones had mild restriction of activities of daily living. (Id. at 543).

In the first physical RFC, it was determined that Jones could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Id. at 548). She could stand and/or walk at least two hours in an eight-hour workday and sit about six hours in an eight-hour workday. She had no limitations on pushing and/or pulling. Weaver said that Jones had muscle strength of five out of five and normal range of motion throughout. (Id. at 548). Weaver stated that Jones was partially credible because the severity she noted was not completely consistent with the objective examination in the file dated May 14, 2009. (Id. at 554).  The second RFC also determined that Jones could frequently or occasionally lift and/or carry 10 pounds. (Id. at 615). She could stand and/or walk at least two hours in an eight-hour workday and sit for about six hours in an eight-hour workday. She was limited in pushing and/or pulling in the lower extremities. (Id.). Her credibility was partial. (Id. at 621).

The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of her limitations. McKinney v. Apfel, 228 F.3d 860 (8th Cir.

2000). To determine Jones' RFC, the ALJ considered Jones' symptoms and the extent to which they were supported by the medical evidence in the record. 20 C.F.R. § 404.1529. As noted previously, the ALJ determined that Jones' statements about her physical limitations were less than credible. The statements from treating physicians did not evaluate Jones' functional abilities or suggest any restrictions that were needed in her daily activities. The RFC finding was reached after considering Jones' daily activities, her treatment, and the entire medical record, and it was supported by those considerations.

In addition, the ALJ explicitly asked the vocational expert to consider a hypothetical claimant like Jones, and the vocational expert testified that the hypothetical claimant could perform Jones' past work as an accounting clerk. (Tr. at 17, 61). Vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work. Lewis v. Barnhart, 353 F.3d 642 (8th Cir. 2003). Jones did not carry her burden to prove that she cannot perform her prior work.

<em>Evaluation of Jones' Age</em>

Finally, Jones argues that the Commissioner failed to evaluate Jones' age as a vocational factor. Her age changed between the time of the onset date set forth in her original application, when she was 47. (Tr. at 166). In the onset date set forth in the second application, Jones was 14 days short of age 50. (Id.). On the date last insured, March 31, 2009, Jones was 53 years old.

A claimant's age is considered in determining a person's disability to a certain extent. Under 20 C.F.R. § 404.1563(d), a person who is between the ages of 50 and 54 is considered approaching advanced age, and the age along with a severe impairment and limited work experience may seriously affect the ability to adjust to other work. If the person is over the age of 55, age significantly affects a person's ability to adjust to other work. 20 C.F.R. § 404.1563(e).

Jones merely argues that the ALJ failed to consider Jones' age as a vocational factor. She does not point to any evidence in the record to suggest that the ALJ did not take Jones' age into consideration. While there is no evidence that the ALJ specifically considered Jones' age, the record is clear that the ALJ properly considered the entire medical record, the opinions of medical experts, and the testimony presented at the hearing. The fact that age may not have been fully considered would not have resulted in a different finding. I find no error related to Jones' age.

## V.    CONCLUSION

The ALJ determined that through the date last insured, Jones was capable of performing past relevant work as an accounting clerk and that this work did not require the performance of work-related activities precluded by Jones' RFC. Therefore, the ALJ found that Jones was not under a disability at any time from September 1, 2005, through March 31, 2009. (Tr. at 17).

I find that there is substantial evidence based on the entire record to support the ALJ's factual findings.  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). I find that the decision must be affirmed.

IT IS ORDERED that the Commissioner of Social Security's decision is affirmed.

Dated March 12, 2014.

BY THE COURT


Warren K. Urbom
United States Senior District Judge